UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BENANCIO R. GONZALEZ, | ) | 1:06cv0083 DLB |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**BACKGROUND**

Plaintiff Benancio R. Rodriguez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for supplemental security income and disability insurance benefits pursuant to Title XVI and Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On June 20, 2006, the Honorable Anthony W. Ishii reassigned the case to the undersigned for all purposes.

1

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his applications on January 31, 2001, alleging disability since October 16, 2000, due to an aneurism and vision problems. AR 135-145. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 84-87, 89-92, 103. On April 7, 2005, ALJ Michael J. Haubner held a hearing. AR 507-547. ALJ Haubner denied benefits on April 28, 2005. AR 14-23. The Appeals Council denied review on December 17, 2005. AR 7-10.

Hearing Testimony

ALJ Haubner held a hearing on April 7, 2005, in Fresno, California. Plaintiff appeared with his attorney, Allan Cohan. Vocational expert ("VE") Thomas Dachelet also appeared and testified. AR 507.

Plaintiff testified that he was born in 1948 and has a GED. AR 516. His past work included landscaping, farm work, and order pulling. AR 517-518. Plaintiff has not worked since 2000.

Plaintiff testified that the last time he had any alcohol was either 1984 or 1985 and that the last time he did any street drugs was in the early 1970s. AR 520. Plaintiff lives alone in a trailer, and his driver's license has been suspended since 2001 for his failure to pay child support. AR 520. His cousin drives him when he needs to go somewhere. AR 521. Plaintiff doesn't do any yard work and prepares meals mostly in the microwave, but does do some simple meal preparation about once a day. AR 522. He goes shopping once a week and visits friends and family once a week. He watches television for four to five hours a day and reads for about 30 minutes. AR 523. He sweeps the floors in his trailer once a day and dusts the furniture once a week. He goes to his cousin's house to do laundry about once a week. AR 524.

Plaintiff testified that he cannot work because of his prior surgery, hearing loss, gout, arthritis in his knee, high blood pressure and high cholesterol. AR 524-525. Plaintiff wears glasses that allow him to see well enough to avoid hazards. AR 525. He has pain in his lower

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

back that bothers him about once a month. He also gets headaches on the right side of his head about twice a week, and they last about a day. AR 526. He rates his pain as a five on a scale of one to ten. AR 527.

For all hypotheticals, the ALJ asked the VE to assume a person of Plaintiff's age, education, and experience. For the first hypothetical, the ALJ asked the VE to assume a person who could lift and carry 100 pounds occasionally, 50 pounds frequently, who had to avoid climbing to high places, operating heavy machinery and occupations that require exact bilateral vision. The VE testified that this person could perform Plaintiff's past work of order puller. AR 531. The VE further testified all unskilled sedentary, light and medium work would be available to this person. Heavy work would be reduced by 50 percent. AR 532.

For the second hypothetical, the ALJ asked the VE to assume a person who could lift and carry 50 pounds occasionally, 25 pounds frequently, who had to avoid ladders, ropes and scaffolds, who could frequently climb ramps and stairs, and who could occasionally balance and stoop. This person also should avoid frequently looking to the right and working at unprotected heights or near dangerous machinery. AR 532-533. This person could perform Plaintiff's past work as a farm worker and order puller. This person could also perform unskilled sedentary, light and medium work. AR 533.

For the third hypothetical, the ALJ asked the VE to assume that this person was slow to comprehend, and may have difficulties receiving instructions and staying on track. This person could not perform any work. AR 534.

For the fourth hypothetical, the ALJ asked the VE to assume that this person often experienced pain, fatigue, or other symptoms severe enough to interfere with attention and concentration. This person could walk one to two city blocks, could sit for 20 minutes at a time, stand for 20 minutes at a time, and could sit, stand and walk for less than two hours total. This person would not be able to perform any work. AR 534.

When asked by the ALJ, Plaintiff testified that he could carry about 10-15 pounds and could sit without getting up for 30 minutes, at most. He could walk about three blocks before needing to stop and rest. He lies down about once a day, for an hour, because of pain or fatigue.

AR 534-535.  He thought he could pay attention to something before losing concentration for about 10-15 minutes.  AR 536.

For the fifth hypothetical, the ALJ asked the VE to assume a person who could lift and carry 10 to 15 pounds, sit 15 to 30 minutes at a time, and walk three blocks at a time.  This person must have one one-hour, unscheduled break per day.  This person has difficulty maintaining attention and concentration beyond 10 to 15 minutes at a time.  The VE testified that this person could not perform Plaintiff's past relevant work or any other work.  AR 536.

When questioned by his attorney, Plaintiff explained that he has balance problems.  Sometimes when he walks, he runs into a wall.  He fell over once last year and last ran into something a couple of days ago.  He estimated that he ran into things about once a week.  He further testified that he loses his grip with his right hand because two of his fingers get numb.  AR 537-539.  The VE testified that if the limitation of reduced grip strength was added to the fifth hypothetical, this person could not perform any work.  AR 540.

Plaintiff further testified that his right eye gets blurry when the wind "is kind of cold."  He gets headaches about twice a month that last about a day.  AR 541.  He also has difficulty hearing in his right ear and sometimes has to turn towards the sound to hear it.  AR 543.

Plaintiff also testified that he's had gout twice this year, and that it lasts about two months.  He doubted he could work during those two months because his ankle and knees swell and he can't put weight on his legs.  AR 543.  He takes pain medication during this time.  AR 544.  He cannot dress himself during this time and mostly stays in bed.  AR 545.  The VE testified that if someone missed two months of work out of 12, this person could not perform any work.  AR 546.

Medical Record

On October 16, 2000, Plaintiff sought treatment at Alta District Hospital because of headaches.  A CT scan revealed a diffuse subarachnoid hemorrhage and Plaintiff was eventually diagnosed with an aneurysm that had ruptured.  AR 202.  Plaintiff underwent surgery for the aneurysm on October 18, 2000, and had a shunt placed on October 27, 2000.  AR 211.  He was discharged from the hospital on November 9, 2000, and instructed to follow up with his doctor in

six weeks for routine postoperative neurosurgical care.  AR 211.  At the time of discharge, Plaintiff was considered stable and was moving all extremities well.  AR 210.

From January 2001, through February 2003, Plaintiff was treated at the Dinuba Health Center by Physician's Assistant ("PA") Christina Erwin, and Hanh Hoang, M.D.  AR 381.  His treatment was primarily for hypertension.  AR 351-381.

On November 3, 2001, Plaintiff saw Benjamin Chang, M.D., for a comprehensive neurological evaluation.  Plaintiff complained of ringing sensations over his right ear with decreased sensation and numbness over the right side of his forehead with occasional blurred vision.  He reported that he stays home and does some yard work and light chores.  Plaintiff had no trouble getting on or off the examination table or taking his shoes off.  He could walk on toes, heels and in tandem.  Plaintiff had a well-healed surgical scar over his parietal and temporal lobe of the right side of his head, with no tenderness.  He had asymmetry with his forehead and decreased movement on the right side.  Motor strength and muscle tone were normal, but sensation was mildly decreased to pinprick over the right side of his forehead.  On mental examination, he was alert, awake and oriented to person, place and time.  There was no evidence of aphasia, apraxia or dysarthria. AR 342-344.

Dr. Chang diagnosed an aneurysm repair with mild dysesthesia on the right side of his forehead with some ringing sensation, and occasional blurry vision in his right eye.  Dr. Chang opined that Plaintiff had no functional limitations.  AR 345.

In October 2002, Plaintiff was seen in the neurology clinic of Hillman Health Center for complaints of right-sided facial numbness, forgetfulness and anxiety.  AR 356. An EEG was ordered for his confusion.  AR 357.

On November 24, 2002, Plaintiff underwent a neurological consultation by Jill Ostrem, M.D.  On mental status examination, Plaintiff was alert and oriented, with normal attention, normal fluent speech, naming and repetition.  He was able to spell "world" forward and backward correctly and had normal comprehension.  Movement in his right eye was limited but he had normal visual fields.  His hearing was reduced on the right and he had abnormal

1  hyperkinetic movements of the mouth.  He had decreased sensation on the right side of his face.
2  AR 348.  His coordination was normal and he walked with a normal gait.  AR 349.
3        Dr. Ostrem opined that Plaintiff could lift and carry 50 pounds frequently and 100 pounds
4  occasionally, and could stand and walk for six hours.  He could sit without restriction.  He could
5  not climb in high places or operate heavy machinery.  He should avoid occupations that require
6  the use of exact vision based on his double vision when he looks to the right.  AR 349.
7        State Agency neurosurgeon Sadda Reddy, M.D., reviewed Plaintiff's records and
8  assessed his residual functional capacity on January 14, 2003.  He opined that Plaintiff could
9  perform medium work with postural and environmental limitations.  AR 392-401.
10        On May 27, 2003, State Agency physician Brian Ginsburg, M.D., completed a Physical
11  Residual Functional Capacity Assessment.  He opined that Plaintiff could occasionally lift 50
12  pounds, 25 pounds frequently, could stand and/or walk about six hours in an eight hour workday,
13  and could sit about six hours in an eight hour workday.  He was unlimited in pushing and pulling,
14  but could never climb ladders, ropes or scaffolds.  He could occasionally balance and stoop, and
15  could frequently climb ramps and stairs, kneel, crouch and crawl.  As for visual limitations, Dr.
16  Ginsburg indicated that Plaintiff was limited in near and far acuity, depth perception,
17  accommodation, color vision and field of vision.  When asked to describe how he was limited,
18  Dr. Ginsburg indicated that Plaintiff "had to avoid occupations that require frequently looking to
19  the right."  He also had to avoid all exposure to hazards such as dangerous machinery and
20  heights.  AR 383-391.
21        On May 28, 2003, his hypertension was noted as being under control.  He was again
22  advised to stop smoking and told that his hypertension, along with smoking, increases his
23  chances for another coronary event.  AR 414.
24        In July 2003, PA Christina Practitioner Erwin completed a form questionnaire and
25  indicated that Plaintiff's conditions (shortness of breath and early renal failure) cause him to be
26  slow to comprehend.  She opined that Plaintiff might have difficulties receiving instructions and
27  staying on track.  AR 418.
28

In August 2003, Plaintiff presented to the Dinuba Health Clinic in no physical distress and with no physical complaints. Despite numerous instructions to stop smoking, he had not done so. He was assessed with elevated renal function tests and hyperlipidemia. AR 409.

In December 2003, PA Erwin and Dr. Hoang answered a form questionnaire and indicated that Plaintiff could engage in regular, sustained activity if allowed frequent rest periods. AR 417.

In February 2004, Plaintiff began complaining of a painful left knee and indicated that it had bothered him on and off for the about two years. AR 430, 432. Upon examination, he was in intense pain and could not flex the knee at all due to the pain. The examination was limited due to his severe discomfort. He was advised to rest and keep his leg elevated with sitting. AR 432. X-rays taken on February 13, 2004, revealed degenerative changes of the patella and possible increased density to the proximal tibial shaft that could be an artifact or boney sclerosis. He was given pain medications and referred to the orthopedic clinic. AR 430.

Plaintiff was seen by Alan M. Stark, M.A., on February 15, 2004, for an audiological evaluation. He had mild to severe hearing loss, with greater involvement in the right ear, and significantly-reduced speech discrimination abilities, bilaterally. He opined that the condition was permanent and stationary and only correctable with a hearing aid system. AR 459.

In March, he continued to complain of chronic pain but had full range of motion. AR 458.

On April 2, 2004, Plaintiff saw J.R. Lee, M.D., for a recheck of his knee pain. His knee was not swollen, range of motion was full, there was no crepitus, there were minimal symptoms and there was no effusion. He had ankle pain but no foot pain, and his tests for rheumatoid factor and ANA were negative. His uric acid level was high, however. Dr. Lee opined that Plaintiff had mild arthritis in his knee, but he was not sure if it was from gout. Since it was not swollen, there was no need for aspiration. AR 428.

On April 7, 2004, Plaintiff was seen in follow-up for ankle pain. He was diagnosed with hypertension and gout and started on a low dose of anti-gout medications. He was again advised

to stop smoking because it could be contributing to his complaints of gout and hypertension.  AR 427.

On June 4, 2003, Plaintiff was diagnosed with early renal failure.  AR 419.  He began treatment with Magdy G. Masky, M.D., on September 25, 2003, for chronic renal insufficiency.  AR 473.

On June 25, 2004, Plaintiff was instructed to discontinue his gout medication because it could add to his kidney problems.  AR 425.

On August 17, 2004, PA Erwin and Dr. Hoang completed a Stroke "Residual Functional Capacity Assessment" form.  They opined that Plaintiff could sit for 20 minutes at a time, stand for 20 minutes at a time, and could sit, stand and/or walk for less than two hours in an eight hour day.  They further opined that Plaintiff would need breaks of 10-15 minutes every hour.  He could rarely lift less than 10 pounds or climb stairs, and could never twist, stoop/bend, crouch or climb ladders.  However, he did not have "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross dextrous movement or gait and station."  AR 451-453.  They also completed an "Arthritis Residual Functional Capacity Questionnaire" in which they imposed the same limitations.  AR 454-457.

Plaintiff was seen in September 2004 for follow up on his hypertension.  He was advised to stop smoking, again, and lose weight.  AR 450.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of status post craniotomy repair of a cerebral aneurism.  AR 18.  He found his hypertension and hearing loss to be non-severe impairments.  After reviewing the medical evidence and Plaintiff's testimony, the ALJ concluded that Plaintiff's alleged impairments were not supported by the record to the degree alleged.  He determined that Plaintiff retained the residual functional capacity ("RFC") to return to his past work as a farm laborer, Mexican food maker and order puller.  AR 21.  In the alternative, the VE testified that Plaintiff could perform a significant number of sedentary, light and medium unskilled jobs.  AR 21.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

1  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3]  Applying this process in this case, the ALJ
2  found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of
3  his disability; (2) has an impairment or a combination of impairments that is considered "severe"
4  (status post craniotomy repair of a cerebral aneurism) based on the requirements in the
5  Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of
6  impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P,
7  Regulations No. 4; (4) retains the RFC to perform his past relevant work; or, alternatively, (5)
8  despite non-exertional limitations, could perform a significant number of unskilled, sedentary
9  light and medium jobs.  AR 22.

Plaintiff argues that (1) the ALJ incorrectly found that his impairment did not meet the Listing of Impairments; (2) the RFC finding was contrary to the record; (3) the ALJ incorrectly determined that he could perform his past work; and (4) the ALJ incorrectly determined that he could perform alternate work at all exertional levels.

**DISCUSSION**

A.   Listing of Impairments

Plaintiff believes that the ALJ erred in determining that his neurological impairment did not meet the Listing of Impairments, and argues that the evidence supports a finding that his impairment meets Listing 11.04.

The listings of impairments describe impairments "that are considered severe enough to prevent an adult from doing any gainful activity." 20 C.F.R. § 416.925(a).  Most of these impairments are permanent or expected to result in death.  *Id.*  For all other impairments, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months.  *Id.*  If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry.  20 C.F.R. § 416.920(d).

To demonstrate that an impairment matches a listed impairment, the claimant must show that the impairment meets all of the medical criteria in a Listing.  *Sullivan v. Zebley*, 493 U.S.

---

[3]All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

521, 530 (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1526(a), 416.926(a). Under the law of this circuit, "[i]t is unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every different section of the listing of impairments." *Gonzales v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir.1990).

Listing 11.00F explains the nature of Traumatic Brain Injuries:

TBI may result in neurological and mental impairments with a wide variety of posttraumatic symptoms and signs. The rate and extent of recovery can be highly variable and the long-term outcome may be difficult to predict in the first few months post-injury. Generally, the neurological impairment (s) will stabilize more rapidly than any mental impairment (s). **Sometimes a mental impairment may appear to improve immediately following TBI and then worsen, or, conversely, it may appear much worse initially but improve after a few months. Therefore, the mental findings immediately following TBI may not reflect the actual severity of your mental impairment (s).** The actual severity of a mental impairment may not become apparent until 6 months post-injury.

Listing 11.04 deals specifically with central nervous system vascular accidents, and supports a finding that the impairment meets the Listing when it occurs with one of the following more than three months post-vascular accident:

A. Sensory or motor aphasia resulting in ineffective speech or communication; or

B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

Here, Plaintiff contends that he meets subsection A because the "uncontradicted record" shows (1) "moderate-severe linguistic deficit" and (2) "profound aphasia- not following verbal commands. Not responding to questions."

Plaintiff's argument is unconvincing. The evidence he cites is from treatment notes dated November 4, 2000, and November 9, 2000, which were made very soon after his October 16, 2000, surgery. AR 223, 230. As Listing 11.00F notes, and as the record in this case demonstrates, a mental impairment "may appear much worse initially but improve after a few

months. Therefore, the mental findings immediately following TBI may not reflect the actual severity of your mental impairment."

Upon Plaintiff's discharge on November 9, 2000, he still had "intermittent aphasia." AR 210. When Plaintiff began treatment at Dinuba Health Center in January 2001, there was no indication that he suffered from aphasia that resulted in ineffective communication or speech. In fact, on January 5, 2001, when he presented for his initial visit, Dr. Hoang indicated that he "[spoke] very clearly and [was] easy to understand." AR 380. He followed directions, and was alert and oriented. AR 380. Although there are references to speech therapy in January and February 2001, there is no evidence that such therapy occurred and there is certainly no evidence that he suffered any significant aphasia in the remainder of the records.

Moreover, during his November 2001, consultive examination with Dr. Chang, Dr. Chang found no evidence of aphasia, apraxia or dysarthria. AR 344. Plaintiff faults Dr. Chang's findings because he is not a neurologist, yet even Dr. Ostrem, who performed the neurological consultation in November 2002, found that Plaintiff had "normal attention, normal fluent speech, naming, repetition." AR 348. In citing Dr. Ostrem's opinion in support of his argument, he contends that Dr. Ostrem found abnormal hyperkinetic movement of the mouth, and since there is no statement that this movement did not result in speech aphasia, there is no evidence of improvement from his original November 2000 treatment records. Plaintiff's argument is absurd given Dr. Ostrem's explicit finding that Plaintiff demonstrated "normal fluent speech." Finally, even Plaintiff's treating sources indicated that he had no speech or communication difficulties in setting forth his symptoms. AR 451.

Nor can Plaintiff argue that he meets subsection B. There is no evidence of anything other than normal motor function and gait, apart from a notation in February 2004, that Plaintiff was having trouble walking because of knee pain. AR 423. Even as soon as his discharge in November 2000, Plaintiff was moving all extremities well. AR 210. In November 2001, he had no trouble getting on or off the examination table, taking his shoes off, walking on his toes and heels, or walking in tandem. AR 343. He did not need an assistive device and had no limitations in standing or walking. AR 345. During his neurological examination, he walked with a normal

gait, could walk on his heels and toes and perform tandem gait. AR 349. In the August 2004 questionnaire, his treating source(s) specifically denied that Plaintiff had "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station." AR 452.

The ALJ's determination that Plaintiff did not meet any of the Listings of Impairments was supported by substantial evidence and his argument must be denied.

B.  RFC Finding

Next, Plaintiff argues that the RFC finding is contrary to the evidence of record. In so arguing, he contends that the ALJ incorrectly dismissed the forms completed by his doctor and PA, as well as other medical records.

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or equivalent work schedule. SSR 96-8p. The RFC assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p. In assessing a claimant's RFC, the ALJ may rely upon the state agency physician's findings as to claimant's ability. 20 C.F.R. §§ 404.1513(c), 404.1527(f)(2)(I), 416.913(c), 416.927(f)(2)(I).

Here, the ALJ determined that Plaintiff could lift and carry 50 pounds occasionally, 25 pounds frequently, and could sit, stand and walk for six hours. He could occasionally balance and stoop, but could never climb ladders, ropes or scaffolds. He needed to avoid occupations that would require frequent looking to the right and all exposure to hazardous machinery and heights. AR 21.

In formulating this RFC, the ALJ gave greater weight to the opinions of the State Agency physicians, which he found to be consistent with the overall medical record. AR 20. The ALJ was permitted to credit their opinions over those of Plaintiff's treating sources because he also relied on other evidence, such as the opinions of the examining consultive physicians. *Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir.1989). The ALJ set forth the opinions of Dr. Ostrem and Dr. Chang, which also directly contradicted the opinions of his treating sources

13

and supported his RFC finding.  AR 20.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) ("Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.")

Indeed, the opinions of Dr. Hoang and PA Erwin were contrary to those of the State Agency physicians and the consultive examiners.  In such a situation, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence in the record for rejecting the treating sources' opinions.  *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

The ALJ set forth numerous reasons supporting his decision to reject their opinions, which were submitted on fill-in-the-blank, check-the-box-type forms.  He noted that the restrictive opinions lacked bases, i.e., whether they were based on signs, test results, subjective complaints, or objective findings and observations.  AR 20.  A brief and conclusionary form opinion which lacks supporting clinical findings is a legitimate reason to reject a treating physician's conclusion.  *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  He further explained that the forms were not consistent.  For example, the form from July 2003, indicated that Plaintiff was slow to comprehend and may have difficulties receiving instructions and staying on track, yet the December 2003, form did not list any functional limitations.  AR 20, 417, 418.  He noted that the July 2003, form was only signed by PA Erwin, who, without additional information, he could not determine to be an acceptable medical source.  AR 20; 20 C.F.R. § 404.1513(a) and (d).  To clarify the opinions and to get additional information, the ALJ wrote Dr. Hoang and PA Erwin a letter dated March 16, 2005, and set forth the additional information he needed.  AR 199.[4]  The ALJ held the record open through the date of his decision, April 28, 2005, but he did not receive a response.  AR 20.  The ALJ therefore gave these opinions little weight.  AR 20.

---

[4] Plaintiff contends that the record is "devoid of any such inquiry."  Opening Brief, at 12.  Plaintiff is incorrect.

Moreover, the limitations set forth in the August 2004 forms are also contradicted. Dr. Hoang indicated that Plaintiff often experienced pain, fatigue, or other symptoms severe enough to interfere with attention and concentration, that he could walk one to two city blocks, that he could sit for 20 minutes at a time and that he could sit, stand and walk for a total of less than two hours. AR 451-457. However, in April 2004, Dr. Lee examined Plaintiff's knee and found no swelling, a full range of motion, no crepitus, minimal symptoms and no effusion. AR 428. Dr. Lee opined that Plaintiff had mild arthritis in his knee. AR 428. Similarly, during his visits to Dr. Hoang in April, June and July 2004, there is no mention of knee pain. AR 423, 425, 426, 427.

Based on the above, the ALJ gave specific and legitimate reasons for rejecting the opinions of his treating sources.

C.   Plaintiff's Past Relevant Work

Plaintiff next argues that the ALJ incorrectly determined that he could perform his past relevant work. Plaintiff attacks each individual hypothetical posed to the VE and contends that the ALJ improperly assessed his credibility.

At step four of the sequential evaluation process, the ALJ must determined whether a claimant can perform any of his past relevant work. 20 C.F.R. § 404.1520. At this step, the claimant has the burden of proving that he can no longer perform his past relevant work. *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001). Although the claimant retains the burden, the ALJ must make the requisite factual findings to support his conclusion by comparing the RFC to the physical and mental demands of Plaintiff's past relevant work . SSR 82-62.

Based on the testimony of the VE, the ALJ concluded that Plaintiff could perform his past relevant work as a farm laborer, Mexican food maker and order puller. AR 21. Testimony by a VE about a claimant's past relevant work either as actually performed or as generally performed in the national economy provides a sufficient basis for the ALJ's analysis. *Pinto*, 249 F.3d at 845. Insofar as Plaintiff contends that the medical record supports the adoption of other hypotheticals, the Court has explained that the ALJ properly rejected the limitations of the other medical sources and arrived at a properly supported RFC.

Plaintiff also argues that the ALJ erred in finding Plaintiff not credible and therefore erred in not adopting the hypothetical question based on Plaintiff's testimony. Specifically, Plaintiff argues that the ALJ failed to mention any of the factors set forth in SSR 96-7p. The SSRs do not have the force of law, however. Although they are entitled to deference, there is no requirement that the Court follow SSR 96-7p in evaluating credibility where the ALJ provides a sufficient analysis. *See eg. Bunnell v. Sullivan,* 947 F.2d 341, 346 n. 3 (9th Cir.1991) (en banc).

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)). Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

"The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

Here, the ALJ noted his obligation to review Plaintiff's credibility pursuant to SSR 96-7p. He first explained that the overall medical evidence did not support the intensity of his claimed impairments. AR 19. Although an ALJ can't disbelieve a Plaintiff's allegations based solely on the medical record, it is certainly a valid consideration. *Rollins v. Massanari*, 261 F.3d 853, 856-857 (9th Cir. 2001). The ALJ next set forth discrepancies in Plaintiff's testimony, including inconsistent testimony about his alleged gout, his daily activities and his use of drugs and

16

alcohol. AR 19. *Batson*, 359 F.3d at 1196 (ALJ properly determined credibility where claimant's testimony was contradictory and unsupported by medical evidence); 20 C.F.R. §§ 404.1513, 416.913.

Next, the ALJ set forth Plaintiff's daily activities, including leaving his house twice a day, preparing means, doing chores and laundry, and going shopping. AR 19. Plaintiff testified at the hearing that he sweeps, prepares simple meals once a day, mops th floors, dusts and goes grocery shopping once a week. AR 19. *Morgan v. Commissioner of Social Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

Finally, the ALJ compared Plaintiff's allegations to his behavior at the hearing. For example, Plaintiff said he could sit for only 15 to 30 minutes maximum, but sat through the one hour hearing even though the ALJ told him he could get up and move around if necessary. AR 19. He also testified that he could only concentrate for 10 to 15 minutes, yet he was able to pay attention and respond appropriately throughout the one hour hearing. AR 19. An ALJ's observations during the hearing, along with other evidence, constitutes substantial evidence. *Drouin v. Sullivan,* 966 F.2d 1255, 1258-59 (9th Cir. 1992).

"Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation … and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision." *Fair*, 885 F.2d at 603.

The ALJ's adoption of the hypothetical question leading to his finding that Plaintiff could perform his past relevant work is supported by substantial evidence. His claim is without merit and must be denied.

D.   <u>Alternative Work</u>

Finally, Plaintiff contends that the ALJ's alternate finding that Plaintiff could perform other work is contrary to law. He argues that he suffered from non-exertional impairments, but the ALJ heard "virtually no testimony of alternative work."

While significant non-exertional impairments may make reliance on the grids inappropriate, the mere allegation of a non-exertional limitation does not automatically preclude the application of the grids. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d

17

573, 577 (9th Cir. 1988). If the ALJ finds that a non-exertional limitation exists, and that it significantly affects the range of work described in the grids, use of the grids would be inappropriate and a vocational expert would be needed to describe what, if any, jobs existed in the national economy that plaintiff would be able to perform. *Id.*

Here, the ALJ made an alternate finding at step five that Plaintiff could perform a significant number of jobs in the national economy. AR 21. He was not required to do so, however, because he properly found at step four that Plaintiff could perform his past relevant work. Recognizing this, Plaintiff requests that the Court grant relief for this issue only if the Court found that the step four finding was unsupported by substantial evidence. As explained above, the step four analysis was proper, thus making the instant issue irrelevant.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Jo Anne B. Barnhart, Commissioner of Social Security and against Plaintiff, Benancio R. Gonzales.

IT IS SO ORDERED.

Dated: **March 21, 2007**        **/s/ Dennis L. Beck**
3b142a                             UNITED STATES MAGISTRATE JUDGE